# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 50279 | **DATE** | 5/23/2001 |
| **CASE TITLE** | | MASTERS vs. HESSTON CORP. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Hesston's motion to exclude expert testimony is granted, as is its Rule 56 motion for summary judgment. This cause is hereby dismissed in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| X | Notices mailed by judge's staff. | | | MAY 24 2001 | | 19 |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | docketing deputy initials | | |
| | Mail AO 450 form. | | | 5-23-01 | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| /SEC | courtroom deputy's initials | | | SW | | |
| | | | | mailing deputy initials | | |

CLERK, U.S. DISTRICT COURT

2001 MAY 23 PM 4:10

Date/time received in central Clerk's Office

# United States District Court
## Northern District of Illinois
### Western Division

**DOCKETED**

MAY 2 4 2001

David Masters

**JUDGMENT IN A CIVIL CASE**

v.

Case Number: 99 C 50279

Hesston Corporation

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■ Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Hesston's motion to exclude expert testimony is granted, as is its Rule 56 motion for summary judgment. This cause is hereby dismissed in its entirety.

FILED-WD
2001 MAY 23 PM 4: 10
CLERK
U.S. DISTRICT COURT

Michael W. Dobbins, Clerk of Court

Date: 5/23/2001

Susan Wessman, Deputy Clerk

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

**DOCKETED**

**MAY 2 4 2001**

David Masters,                    )
                                  )
        Plaintiff,                )    No. 99 C 50279
                                  )
    v.                            )
                                  )
Hesston Corporation,              )
                                  )
        Defendant.                )

## MEMORANDUM OPINION AND ORDER

### Introduction

On July 28, 1999, plaintiff David Masters ("Masters") filed

a two-count complaint against Hesston Corporation ("Hesston"), in

state court, alleging product liability (Count I) and negligence

(Count II). Hesston properly removed the complaint to this

court, based on diversity jurisdiction. See 28 U.S.C. §§ 1332,

1441. Venue is proper as the events giving rise to Masters'

claims occurred in this district and division. See id. §

1391(a)(2). Currently pending is Hesston's motion for summary

judgment, filed pursuant to FED.R.CIV.P. 56, and a motion to

exclude the testimony of Masters' expert witness, Dr. Paul Walker

("Walker"), under FED.R.EVID. 702.

### Facts

On September 27, 1997, Masters suffered an accident with a

hay baler which resulted in the amputation of his right arm.

(LR56.1(a) ¶¶ 47, 50) The hay baler was a feed roll baler, Model

5600, manufactured by Hesston.  (Id. ¶ 18; Compl. ¶ 2)  The Hesston Model 5600 was sold between May 1974 and May 1975, at which point it was discontinued and replaced with a different feed roll baler.  (LR56.1(a) ¶ 19)  During this time period Hesston was selling its Model 5600 to dealers within a month or two of manufacture.  (Id.)

The round hay baler, of which Hesston's Model 5600 was one, was first introduced into the American marketplace in about 1971.  (Id. ¶ 1)  Farmers liked round hay bales (as opposed to square bales) because they had a dense exterior, which shed water and minimized spoilage.  (Id. ¶ 4)  They could be moved and stored outside by one person with a tractor.  (Id.)  Vermeer Manufacturing Company ("Vermeer") was the first company to develop and patent a commercially viable round hay baler.  (Id. ¶ 3)  Before and after the introduction of the Vermeer round baler, numerous companies in the United States and Australia were experimenting with round balers using a ground roll design.  A baler using a ground roll design means the baler forms the bale by pushing and rolling the hay along the ground.  (Id. ¶¶ 5-6)  As the bale rolls along the ground, it picks up rocks, sticks and other debris.

The Vermeer technology was unique in that its baler formed the bale completely inside the machine and above the ground, thereby forming a bale that was "cleaner" and more dense than

-2-

that formed by ground roll balers. (Id. ¶¶ 8, 13)  The crop
entered feed rolls at the bottom front of the baler.  The feed
rolls were two rollers, mounted within an inch or so of one
another and rotating in opposite directions.  (Id. ¶ 9)  The feed
rolls compressed and aggressively pulled the crop into the inside
chamber of the baler where it was captured and rotated
continuously by rows of rubber belts.  The belts continued to
spin the hay until a full-sized bale was formed.  At that point
the bale was ready to be tied.  A large roll of twine was stored
on the baler, with its loose end threaded through a thin steel
tube.  The tube was spring-loaded so that when not in use it
rested in a "home position" out of the way of the intake.  When
the last of the hay entered the baler, the farmer pulled a rope
connected to the twine tube, swinging it down a few inches
immediately in front of the intake.  The twine was pulled through
the feed rolls into the baling chamber, where it automatically
wrapped around the rotating bale.  (Id. ¶ 11)  After eight or ten
wraps the farmer released the rope, the twine tube sprang back to
its home position, and a knife-like device cut off the end of the
twine, leaving several inches of twine hanging.  A hydraulic
cylinder controlled from the tractor seat raised the end gate of
the baler and ejected the finished bale out the rear.  (Id. ¶ 12)
Vermeer licensed this technology to other manufacturers in the
early 1970's, including Hesston, because demand for large round

-3-

balers far exceeded Vermeer's production capacity. (Id. ¶ 16)
It was this technology that was used in the Model 5600.

Masters had bought his Hesston Model 5600 hay baler at an
auction on August 21, 1997, for $950. At that time, a new round
baler would have cost about $15,000. (Id. ¶ 35) On either side
of the twine box, which is mounted on the front of the baler a
few feet above the feed rollers, are warning decals. (Id. ¶ 38)
Each decal shows a graphic pictorial of a person with his arm
being pulled through the feed rollers and into the baler, and
reads:

> DEATH OR SERIOUS INJURY CAN RESULT BY MANUAL UNPLUGGING OR
> BY FEEDING CROP OR TWINE INTO FEEDROLL AREA WHILE BALER IS
> RUNNING! THE BALER FEEDS FASTER THAN YOU CAN RELEASE
> MATERIAL. DISENGAGE PTO AND SHUT OFF ENGINE.

(Id. ¶ 39)

From the beginning, Masters encountered two separate
problems with his hay baler. (Id. ¶ 40) First, the twine would
not feed through the feed rolls. (Id.) Second, when there was a
full bale ready to be tied in the bale chamber, if he shut the
power off, the bale would not spin when he turned the power back
on. (Id. ¶ 42) As a result, Masters resorted to handfeeding the
twine into the rollers as the baler was running. He did this by
wrapping the end of the twine around a fistful of hay and tossing
it into the rollers. On the day of the accident, the twine
apparently became tangled in the exit hole of the twine box and
snagged so that the hay stopped, but the momentum kept his hand

-4-

going into the machine.  (<u>Id</u>. ¶ 49)  Because the baler was running, his right arm was immediately pulled into the feed rolls up to his mid-forearm.  (<u>Id</u>. ¶ 50)

**Analysis**

**A.    Standard**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED.R.CIV.P. 56(c); <u>Geboy v. TRL Inc.</u>, 159 F.3d 993, 997 (7th Cir. 1998).  All reasonable inferences are to be drawn from the record in the light most favorable to the non-moving party.  <u>Geboy</u>, 159 F.3d at 997.  The existence of some factual dispute does not defeat an otherwise properly supported motion for summary judgment; the dispute must involve a material fact.  <u>Id</u>.  In conjunction with deciding a motion for summary judgment, when the case turns on the reliability of a party's expert witness, as here, the court employs the two-step inquiry for evaluating expert testimony under Rule 702.  <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993); <u>Kirstein v. Parks Corp.</u>, 159 F.3d 1065, 1067 (7th Cir. 1998), <u>cert. denied</u>, 526 U.S. 1065 (1999).

**B.    Count I**

Hesston initially argues Masters' product liability claim in

-5-

Count I is barred by Illinois' statute of repose.[1]  According to

the statute, "no product liability action based on the doctrine

of strict liability in tort shall be commenced except within the

applicable limitations period and, in any event, within 12 years

from the date of first sale, lease or delivery of possession by a

seller."  735 ILL. COMP. STAT. 5/13-213(b).  Both parties agree

Hesston is a seller as defined by the statute.  See id. § 5/13-

213(a)(4).  Hesston argues its Model 5600 was manufactured no

later than May 1975 and sold within a few months.  (Memo., p. 2;

LR56.1(a) ¶ 19)  Masters' accident occurred more than twenty-two

years after the first sale of the baler.

     Masters argues the repose period has been extended because

of the "alteration exception" set forth in § 13-213(c).  Under

Illinois' repose statute, a product liability action to recover

for injury or damage claimed to have resulted from an alteration,

modification or change of the product is not barred by the 12-

year repose period if three conditions are met.  735 ILL. COMP.

STAT. 5/13-213(c).  First, the action must be brought against a

seller making, authorizing, or furnishing materials for the

---

[1]     In 1995, the Illinois legislature amended the statute
of repose to include all theories of product liability, including
negligence.  735 ILL. COMP. STAT. 5/13-213(b) (1996).  However, the
Illinois Supreme Court subsequently declared this legislation
unconstitutional.  See Best v. Taylor Mach. Works, 689 N.E.2d
1057 (Ill. 1997).  Therefore, the original statute stands, see
id. at 1105-06, and does not apply to negligence claims.
Dintelman v. Alliance Mach. Co., 453 N.E.2d 128, 131 (Ill. App.
Ct. 1983).

-6-

accomplishment of the alteration, modification or change. Id. §
13-213(c)(1). Second, the action must be commenced, at the
latest, within ten years from the date the alteration,
modification or change was made. Id. § 13-213(c)(2). Third,
there must be proof the alteration, modification or change had
the effect of introducing into the use of the product, by reason
of defective materials or workmanship, a hazard not existing
prior thereto. Id. § 13-213(c)(3).

Masters bears the burden of establishing an exception to
Illinois' repose statute, Crisman v. Peoria & Pekin Union Ry.
Co., 846 F. Supp. 716, 719 (C.D. Ill. 1994); Ocasek v. City of
Chicago, 656 N.E.2d 44, 47 (Ill. App. Ct. 1995), appeal denied,
662 N.E.2d 426 (Ill. 1996), and he has failed to satisfy all of
the prerequisites of § 13-213(c). There is evidence in the
record that the twine tube was bent and at some point had been
re-welded. (Def. Exh. C, Weigand Aff., ¶ 5) Masters argues the
misalignment of the twine tube on his hay baler and the
continuing failure to realign it correctly is an "alteration,
modification or change" in the hay baler. (Resp., p. 7) This
may be so, but Masters has failed to show Hesston was responsible
for this alteration as required by subsection one.

Masters argues Hesston was responsible for the alteration to
the twine tube because it furnished faulty instructions.
According to Masters, the instructions address the proper

-7-

maintenance of the twine tube, yet fail to address the effects of misalignment of the twine tube. (LR56.1(b) ¶¶ 12-14) Masters' argument is based on an erroneous interpretation of the statute. "'[A]lteration, modification or change' means an alteration, modification or change that was made...in the original recommendations, instructions and warnings given with respect to a product including the failure properly to maintain and care for a product." 735 ILL. COMP. STAT. 5/13-213(a)(1). Thus, Masters must show an alteration, modification or change to the original instructions were faulty in such a way so as to introduce into the product a hazard not previously existing. Orrell v. American Hoist & Derrick Co., 602 F. Supp. 64, 66-67 (S.D. Ill. 1985). Here, there is no evidence Hesston ever altered, modified or changed its original instructions and warnings.

As for the second requirement under § 13-213(c), Masters has failed to establish this lawsuit was filed within ten years from the date of the alteration of the twine tube, a fact he admits. (Resp., p. 8) Masters argues the burden rests with Hesston to show when the misalignment of the twine tube occurred. On the contrary; as stated above, the burden rests with him. Because Masters has failed to satisfy the prerequisites for application of § 13-213(c), the statute of repose operates to bar Count I.

## C. **Count II**

### 1. **Negligence**

In Count II, Masters alleges Hesston's Model 5600 hay baler
was defectively designed in that it failed to include a guard
over the roller mechanism's pinch point and was defectively
designed in that it even had a pinch point. (Compl. ¶¶ 6(a),
(b)) Masters also includes a failure to warn claim in Count II.
(Id. ¶¶ 6 (c),(d)) In a negligence case such as this, Masters
must prove Hesston owed him a duty which was breached and an
injury proximately resulted from that breach. Hills v.
Bridgeview Little League Ass'n, 745 N.E.2d 1166, 1178 (Ill.
2001).

The distinction between claims in strict liability and
negligence lies in the fault concept. Baltus v. Weaver Div. of
Kidde & Co., 557 N.E.2d 580, 585 (Ill. App. Ct. 1990). In strict
liability, the focus is on the defective condition of the
product, regardless of fault, whereas in negligence, fault is
additionally an issue. Id. To recover from Hesston for
negligent manufacture of the hay baler, Masters must establish
that Hesston deviated from the standard of care that other hay
baler manufacturers followed at the time the Model 5600 was
designed. Id. at 585-86. The threshold question in both strict
liability and negligence actions is not whether the product could
have been made safer, but whether it was dangerous because it

-9-

failed to perform in the manner reasonably to be expected in light of its nature and intended function. Id. at 586.

Regarding the failure to warn claim, a duty to warn of a particular hazard will be imposed where there is unequal knowledge, either actual or constructive, and the defendant knows or should know that injury may occur if no warning is given. Carrizales v. Rheem Mfg. Co., 589 N.E.2d 569, 573 (Ill. App. Ct. 1991). If the danger is obvious and generally appreciated, there is no duty to warn. Id.

### 2. The Admissibility of Masters' Expert Witness Testimony

In addressing Masters' negligence claim, the admissibility of his expert witness' testimony is key and must be addressed first under the Daubert principles. See Bourelle v. Crown Equip. Corp., 220 F.3d 532 (7th Cir. 2000). Masters argues the Daubert test does not apply (Resp., p. 3), but this is simply not true. Daubert and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), supply the reliability test a court must follow in ensuring an expert's testimony is reliable and relevant. See, e.g., United States v. Lamarre, – F.3d –, No. 00-2440, 2001 WL 418991, at *5 (7th Cir. Apr. 20, 2001); Cummins v. Lyle Indus., 93 F.3d 362, 367 n.2 (7th Cir. 1996). In so holding, the court disagrees with Masters' interpretation of Smith v. Ford Motor Co., 215 F.3d 713 (7th Cir. 2000), where the Seventh Circuit found the district court properly applied the Daubert framework but misapplied the

factors to the expert testimony in dispute.

The court follows a two-step inquiry in evaluating the admissibility of Walker's testimony under Rule 702. <u>Kirstein</u>, 159 F.3d at 1067. First, the court must determine whether the expert's testimony is reliable, meaning whether it is based on reliable methodology. <u>Clark v. Takata Corp.</u>, 192 F.3d 750, 756 (7th Cir. 1999). Second, the court must determine whether the evidence or testimony assists the factfinder in understanding the evidence or in determining a factual issue. <u>Id</u>. at 757. The court finds the methodology Walker used in reaching his opinions is unreliable under the principles set forth in <u>Daubert</u> and <u>Kumho Tire</u>.[2]

The court considers a number of factors in gauging the reliability of expert testimony, including: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance among the relevant scientific community. <u>Daubert</u>, 509 U.S. at 593-94; <u>Smith</u>, 215 F.3d at 719. The Rule 702 test is flexible,

---

[2]    Hesston argues Walker is not qualified to render an opinion in this case because he lacks experience with round balers. (Def. Mot., p. 12) The court rejects this contention. An expert is not considered unqualified merely because his expertise relates to an area other than the one concerning the ultimate issue to be decided by the factfinder. <u>Smith</u>, 215 F.3d at 720. Nevertheless, qualifications alone do not suffice. <u>Clark</u>, 192 F.3d at 759 n.5.

and no single factor is dispositive. Smith, 215 F.3d at 719.
The goal is to make certain the expert, whether basing testimony
on professional studies or personal experience, "'employs in the
courtroom the same level of intellectual rigor that characterizes
the practice of an expert in the relevant field.'" Id. (quoting
Kumho Tire, 526 U.S. at 152).

Walker opined that Hesston's Model 5600 was defective
because its rollers formed a pinch point. He stated Hesston
should have used an alternative design in its Model 5600, one
that did not employ pinch points because if it had, Masters would
not have been injured. Yet, when asked about the availability of
other designs, Walker testified as follows:

> Q: Between 1971 and 1977, that general time frame, if a
> farmer wanted to make and use a large round baler, what
> machines were available to him that you would consider
> not to be defective and unreasonably dangerous?
> A: I don't think I could say that any baler was completely
> without defects, because I have not investigated those
> other round balers in great detail.
> Q: So the answer is you don't know?
> A: Repeat the question.
> Q: Sure.
> The question is, which, if any, round balers were
> available to farmers in the years 1971 through, I'm
> going to say, 1976 that were not defective and
> unreasonably dangerous?
> A: Yes, I would agree that my answer to that specific
> question is I don't know.
> Q: Are you aware of any round baler that was offered in
> the marketplace between '71 and '76 that, in your
> opinion, was reasonably safe?
> A: Again, I have not studied those balers in large detail.
> In my studying of the other balers, I've primarily
> centered on the pressure rollers or other components in
> that area of the baler. So there may be other aspects
> of the baler, PTO shafts, the way that the tires work

> or the way they dump bales or the way the belts are
> attached, that make them unreasonably dangerous. So I
> wouldn't make the blanket statement that any of the
> balers were safe without further investigation.
>
> Q: Let's limit it to the design of the pickup, same
> question?
>
> A: The pickup itself or including the pressure rollers?
>
> Q: Including the pressure rollers, yes.
>
> A: My recollection is that there was a John Deere model
> that had a guard in front of the pickup area that made
> it reasonably safe, and the New Holland baler didn't
> have the pressure rollers.
> Again, I don't think I would make the blanket statement
> that any of these balers were free from defects. I'd
> have to study them more, even in the pickup area. I
> simply haven't investigated those other balers. I've
> not had the reason to do that.
>
> Q: I thought the reason you were here in this case was to
> offer expert opinions on the design of large round
> balers in 1975, the year that this baler was
> manufactured; is that correct?
>
> A: I think I'm here to testify specifically about this
> baler, the 5600 baler, because I have gone out and
> specifically investigated this baler. So I have
> expertise on this particular baler with regard to this
> accident, but I had no reason to go out and investigate
> all balers that were manufactured in that particular
> time frame.

(Def. Exh. B, Walker dep., pp. 56-58)

Walker did not do his own scientific testing to support his

theory that the Model 5600 should have been manufactured without

pressure rollers which formed a pinch point. This is not

necessarily fatal, if he can point to other designs in existence

at the time the product in question was manufactured that were

safer alternatives. Herein lies the problem with Walker's

testimony. By his own admission, Walker stated he did not

investigate any other balers that had been manufactured during

the relevant time period and, therefore, had no opinion as to

-13-

whether safer, alternative designs existed at that time.

Masters argues Walker did not need to perform any testing because the alternative designs he proposed were actually used commercially. Masters essentially characterizes Walker's testimony as an historical account of hay baler designs. (Resp., pp. 5-6) Masters, however, paints the facts too broadly. A plaintiff can use alternative design evidence as circumstantial evidence tending to show a defendant breached its standard of care in manufacturing the product in question, but the alternative design must have been in use at the time of sale considering the available technology. Baltus, 557 N.E.2d at 586 (to recover for negligent manufacture based on defective design, plaintiff must establish defendant deviated from standard of care other manufacturers followed at the time the machine was designed); Rex K. Linder, *Defenses to Product Liability*, 4 ILL. PROD. LIAB. PRAC. (IICLE) § 4.28 (1999). The evidence must also show the alternative design was economical, practical, and effective. Baltus, 557 N.E.2d at 585. Thus, Walker must be able to point to other, safer designs which were in use at the time Hesston manufactured the Model 5600. A close examination of his testimony shows Walker has failed to satisfy this criteria.

For example, Walker points to the New Holland design as an alternative design which lacked pressure points and was in

-14-

existence during the relevant time period.[3]  However, his reliance on this design fails to carry the day.  The New Holland hay baler was based on a completely different system, using steel slats, secured on either end with sprocket-driven chains. (LR56.1(a) ¶ 22)  Hesston's Model 5600 used rubber belts and feed rolls.  Walker had not done any testing of New Holland's design to determine whether it was safe and was unwilling to opine as to whether it was unreasonably dangerous.  Walker cannot simply point to the New Holland hay baler and state that it lacks a pinch point, ergo it is safer.  To satisfy Rule 702's reliability standard, he should have considered a number of factors in forming his opinion, such as:  the degree to which the alternative design was compatible with Hesston's design; the relative efficiency of the two designs; the short- and long-term maintenance costs associated with the alternative design; the ability of the purchaser to service and maintain the alternative design; the relative cost of installing the two designs; and the effect, if any, the alternative design would have on the price of the machine.  See Cummins, 93 F.3d at 369.

Walker also states Hesston's Model 5600 should have had a guard over the pressure points, and points to a John Deere hay

_____

[3]    In about the Fall of 1974, Sperry-New Holland introduced a large round baler, the New Holland Model 850. (LR56.1(a) ¶ 21)  Like the Vermeer design, the New Holland baler formed the baler off the ground and inside the machine.  (Id.)

baler which had a guard. His reliance on this guard is problematic for several reasons. First, the guard was not used until 1977. (LR56.1(a) ¶ 70) The relevant time period for purposes of the Model 5600 is 1975. Second, as with the New Holland hay baler, just pointing to a guard on another hay baler is not enough. Walker needed to show the guard would have worked on Hesston's Model 5600. Cummins, 93 F.3d at 369. He failed to do this. He could not say whether the John Deere model he had seen in a video used feed rollers, nor did he know the positioning of the guard in relation to the feed intake area and the ground. (Def. Exh. B, Walker dep., pp. 83-92) He performed absolutely no testing to determine whether the John Deere guard would work on Hesston's Model 5600 and, more specifically, whether such a guard would interfere with the functionality of the Model 5600. (Id. pp. 90-91) Walker's testimony is filled with statements such as "it seems" and "I would guess." Walker did not himself design a guard which would have worked on the Model 5600, except for an impromptu sketch during his deposition because prior to that time, "no one has asked me to design a guard for this baler yet." (Id. p. 89)

Likewise, he also opines that the pressure rollers in the Model 5600 should have been moved to the rear and more underneath the baler. (Id. pp. 44-46) Yet, Hesston is correct in stating that Walker did no design work, testing, or research to

demonstrate that a round baler with the feed intake rolls moved to such a spot could successfully bale hay.

The deficiencies in Walker's testimony are similar to those found in the testimony of the plaintiffs' experts in Bourelle. There, the plaintiffs were injured when pallets were knocked into the operator compartment of a forklift truck they were operating. Bourelle, 220 F.3d at 534. They claimed the forklift truck was defectively designed. Their expert, a mechanical engineer with experience investigating lift truck accidents, stated the wire mesh guarding on the forklift truck should have been extended higher, so as to prevent the intrusion of objects into the operator compartment. Id. at 535. The Seventh Circuit upheld the district court's finding that the expert's testimony was unreliable under Daubert. In so holding, the Seventh Circuit noted the expert had not performed any engineering testing of his own, had not prepared even preliminary design drawings or performed any risk utility-type testing, never conducted any computer analysis, did not submit his alternative design theories for review to any lab or organization in the industry, nor had his theories been subjected to peer review, and no other manufacturer incorporated his proposed design. Id. at 537.

Likewise, Walker did not prepare even a preliminary design drawing to show how he would have eliminated or moved the pinch point on the Model 5600, or how he would have added a guard. He

-17-

did not submit any alternative design theory to any testing
organization in the industry. He has not shown any of his
theories have been subjected to peer review, nor is there any
evidence he performed any kind of risk utility-type testing with
respect to any of his theories. In fact, Walker's lack of any
stated methodology in comparing hay balers in use in 1975 and the
Model 5600 renders it difficult for this court to apply the
Daubert principles. See Clark, 192 F.3d at 759; Cummins, 93 F.3d
at 369-70.

An industry standard upon which Walker relies actually
emphasizes the weakness in the methodology (or lack thereof) he
used in forming his opinion. The American Society of
Agricultural Engineers promulgated a design standard which was in
effect at the time the Model 5600 was built. (LR56.1(b) ¶ 5)
According to this standard, "[f]unctional components such as . .
. feed rolls . . . which must be exposed for proper function
shall be shielded to the maximum extent permitted by the function
of the component(s)." (Id.) Thus, under this standard, the
appropriateness of a shield is evaluated in light of its impact
on a machine's function. Walker made no attempt to determine how
a shield would impact the functionality of Hesston's Model 5600.

The court also finds Walker's opinion regarding the adequacy
of Hesston's warning fails the reliability test of Daubert. The
same reliability requirements that apply to alternative designs

-18-

apply to alternative warnings. <u>Bourelle</u>, 220 F.3d at 538. Walker opines the warning on the Model 5600 is inadequate because of its location, although he admits the company was actually ahead of its time by including a picture, calling the design "very good." (Def. Exh. B, Walker dep., p. 121) He performed no tests or analyses of any sort to determine whether changing the location of the decal would have enhanced its effectiveness. He could not say with a reasonable degree of engineering certainty that had the decal been in Masters' direct line of sight, rather than on the side of the twine box, it would have prevented him from handfeeding the twine into the rollers. (<u>Id</u>. pp. 124-25) His testimony about the decals is unreliable. <u>See</u> <u>Bourelle</u>, 220 F.3d at 539.

### 3. **Masters' Negligence Claim Without Walker's Testimony**

#### a. **Design Defect**

Some negligence actions do not require expert testimony because they allege "ordinary" negligence, meaning that the claim falls within the common experience and understanding of the jury. <u>Baltus</u>, 557 N.E.2d at 588. Yet, manufacturing negligence cases, such as the instant case, seem particularly appropriate for expert opinion because such cases typically involve specialized knowledge and expert testimony is needed to show the defendant breached its standard of care. <u>See</u> <u>id</u>. at 588-89. Here, without admissible expert testimony, Masters is unable to present

-19-

disputed issues of material fact showing Hesston breached its
duty of care to him.

Masters points to Hesston's open throat hay baler as
evidence of a safer, alternative design.  As with the John Deere
guard, this design was not introduced into the marketplace until
1977, however.  (LR56.1(a) ¶ 26)  Masters argues Hesston could
have introduced this technology sooner, had it not wasted its
time pursuing the Vermeer technology.  (Id. ¶ 15, Pl. Resp.)  The
court rejects this argument as impermissibly speculative.  It is
undisputed that, in manufacturing the Model 5600, Hesston spent
more than 250 hours testing Hesston prototypes and additional
hours testing Vermeer round balers.  (Id. ¶ 18)  During 1975 and
1976, Hesston engineers tried to improve the designs of both the
ground-roll and feed roll baler, and months of field testing was
conducted on numerous experimental designs.  (Id. ¶ 26)  Walker
never reviewed Hesston's test records and, in fact, does not
assert that Hesston was dilatory or overly thorough in the time
it took to invent its open throat baler.  (Id. ¶ 57)  There is no
evidence such developmental testing was a waste of time or was
not par for the course, given the status of technology at that
time.  In fact, Hesston was the first to come up with the open
throat design, after which it licensed its patent to other
manufacturers.  (Id. ¶ 28)

Masters argues he does not have to prove the feasibility of

-20-

safer, alternative designs in existence in 1975. (Resp., p. 10)
This may be so in some cases. But without such evidence here,
given the deficiencies in Walker's testimony, Masters is left
with nothing.

### b. **Failure to Warn**

As for Masters' failure to warn claim, a duty requires a
person to conform to a certain standard of conduct for the
protection of another against an unreasonable risk of harm.
Quinton v. Kuffer, 582 N.E.2d 296, 300 (Ill. App. Ct. 1991).
According to section 2(c) of the Restatement (Third) of Torts
(1997), which governs the duty to warn, a product is defective
because of inadequate instructions or warnings "when the
foreseeable risks of harm posed by the product could have been
reduced or avoided by the provision of reasonable instructions or
warnings by the seller . . . and the omission of the instructions
or warnings renders the product not reasonably safe."

The court finds Hesston's warnings were reasonable and no
duty to warn existed under the facts of this case. The existence
of a duty is a question of law based on the facts presented.
Quinton, 582 N.E.2d at 300. Although Masters' injury was
foreseeable, the existence of a legal duty is not bottomed on
foreseeability alone. Id. at 301. Masters argues that, while
the content of Hesston's decal may have been adequate, the
obscure placement of the decal rendered it ineffective. (Resp.,

p. 10) This argument ignores the fact that Masters admitted he saw the decal and read it. (Def. Exh. E, Masters dep., pp. 166-67) As a matter of law, Hesston had reason to expect that Masters would see its pictorial decal with language which specifically pointed out the dangers of feeding crop or twine into the feedroll area. See Quinton, 582 N.E.2d at 301.

In addition, Hesston correctly notes that Masters understood the dangers associated with the hay baler. (Reply, p. 6) He stated that when he stood at the baler to throw the twine he would not get closer than twelve inches because "it would be suicidal, I think. There's no protection there for you. There's just a lot of wind and noise and movement. It's just too scary. It's a lot safer from a distance when you throw it at it than get down there. I wouldn't want to get down there." (Id. pp. 168-69) Contrary to Masters' argument, his knowledge of the dangers is not an issue of comparative negligence, an issue which is typically reserved for a factfinder. Rather, the existence of the decals and his understanding of the risks involved show Hesston did not owe a duty to Masters. See Ford v. Nairn, 717 N.E.2d 525, 530 (Ill. App. Ct. 1999) (warnings on trampoline were adequate and, therefore, defendants did not owe a duty to warn to plaintiff); Quinton, 582 N.E.2d at 301 (owner of 55-gallon oil drum did not owe duty to welder injured by explosion of drum; "flammable" label was affixed to drum and defendant had reason to

expect plaintiff, an experienced welder, would see label and realize dangers involved); <u>Baltus</u>, 557 N.E.2d at 587-88 (plaintiff did not present sufficient facts to survive summary judgment on his failure to warn claim; he was an experienced mechanic and the risk of using a jack with missing supports was obvious); RESTATEMENT (THIRD) OF TORTS § 2 CMT. i (1997).

### Conclusion

Hesston's motion to exclude expert testimony is granted, as is its Rule 56 motion for summary judgment. This cause is hereby dismissed in its entirety.

**E N T E R :**

_Philip G. Reinhard_

**PHILIP G. REINHARD, JUDGE**
**UNITED STATES DISTRICT COURT**

DATED: _May 23, 2001_